**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **THOMAS HUNT, deceased, by and through his Supervised Administrator, TRACY CHIOVARI,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **No. 07 C 6003** |
| **v.** | ) ) | **Magistrate Judge Jeffrey Cole** |
| **THOMAS DART, as SHERIFF OF COOK COUNTY, and COOK COUNTY,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff's second amended complaint, brought under 42 U.S.C. §1983, charges the Sheriff of Cook County and Cook County – the remaining defendant – with civil rights violations that allegedly led to the death of Thomas Hunt while he was in custody at the Cook County Jail. Count II seeks to hold the Sheriff liable under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978), alleging that the Sheriff is responsible for policies authorizing excessive force and/or deliberate indifference at the jail. Count III is a state law, wrongful death claim against the Sheriff. The Sheriff has filed a motion for summary judgment on both counts..

**I.
BACKGROUND**

**A.
Local Rule 56.1 Requirements**

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. Local Rule 56.1 requires a party seeking summary judgment

to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc.*, 423 F.3d at 633.

If the moving party fails to comply with the rule, the motion can be denied without further consideration. Local Rule 56.1(a)(3); *Smith v. Lamz*, 321 F.3d 680, 682 n.1 (7th Cir. 2003). If the responding parting fails to comply, its additional facts may be ignored, and the properly supported facts asserted in the moving party's submission are deemed admitted. Local Rule 56.1(b)(3)(C); *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008); *Cracco*, 559 F.3d at 632; *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). District courts are "'entitled to expect strict compliance'" with Rule 56.1 and do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the rule's requirements. *Cracco*, 559 F.3d at 632; *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir.2004). The court is not required to hunt for evidence in the record that supports a party's case if a party fails to point

it out; that is the responsibility of counsel. *See Bay Area Business Council*, 423 F.3d at 633 (court

properly disregarded affidavits not referenced in 56.1 submission).

## B.
## Factual Background

On April 27, 2006, Mr. Hunt got drunk and fell while staying at a motel in Worth, Illinois.

(*Sheriff's Rule 56.1 Statement of Facts* ("Shf.St."), ¶ 57-58; *Plaintiff's Response* ("Pl.Rsp."), ¶ 57-

58). He sustained extremely serious injuries, including traumatic brain injury, skull fracture, facial

fracture, aphasia, and impaired cognition. (Shf.St. ¶ 59; Pl.Rsp. ¶ 59). He spent two weeks in the

rehabilitation unit at Advocate Christ Medical Center and was discharged May 11th. (Sheriff's Ex.

25).[1] Following his release from the hospital, he suffered intermittent fainting spells. (Shf.St. ¶ 61;

Pl.Rsp. ¶ 61).

Fast forward about five months to October 22, 2006. Officer James Kaczmark of the Worth,

Illinois, police department responded to a 911 call regarding a disturbance at what he described as

a "flop house." (Sheriff's Ex. 2, Kaczmark Dep., at 6, 21). At the scene, there was one individual

standing outside the building, who identified himself as Michael Kuebler. When Officer Kaczmark

ran the name through the system, the closest name that came up was a Paul Kuebler, whose

description fit the man at the scene and who was wanted by the Palos Park police department and

the Cook County Sheriff's police. (Sheriff's Ex. 2, Kaczmark Dep., at 14). Officer Kaczmark

arrested him. During a cursory search, he found an ID indicating Kuebler was actually Thomas

---

[1] Mr. Hunt was hospitalized from April 27th to May 11th. That is two weeks, not "several weeks" as the Sheriff asserts and plaintiff, for whatever reason, concedes. (Shf.St. ¶ 60; Pl.Rsp. ¶ 60).

Hunt. (Sheriff's Ex. 2, Kaczmark Dep., at 14). Officer Kaczmark arrested him for obstruction because he had falsely identified himself. (Shf.St. ¶ 4; Pl.Rsp. ¶ 4).

Mr. Hunt was transported to the Worth police station, where he was kept overnight. (Shf.St. ¶ 5; Pl.Rsp. ¶ 5). On October 23, 2006, Worth Police Officer, Anthony Ritz, transported Mr. Hunt, alone, to Cook County Circuit Court in Bridgeview, Illinois for his bond hearing. (Shf.St. ¶¶ 6-7; Pl.Rsp. ¶¶ 6-7). Following the hearing, Cook County Corrections officers took him to the Cook County Jail. (Shf.St. ¶ 8; Pl.Rsp. ¶ 8). Once there, Mr. Hunt was taken to an intake area and placed in a "bull pen" prior to being classified, processed, and having his personal property inventoried. (Shf.St. ¶¶ 9-10; Pl.Rsp. ¶¶ 9-10). Detainees at the jail are also examined by Cermak Health Services Medical Technicians, who prepare intake sheets reflecting their medications. (Shf.St. ¶¶ 14-15; Pl.Rsp. ¶¶ 14-15). This is usually done after property inventory, but the order of processing is inconsistent. (Sheriff's Ex. 4, Maxwell Dep., at 23, 40-41, Ex.7, Gatlin Dep., at 16). Physicians visit the facility at regularly scheduled times and attend to any detainees in the bullpen who need to see a doctor. (Sheriff's Ex. 5, Colon Dep., at 20-21). On rare occasions, a detainee might request medical attention and a physician would be called. (Sheriff's Ex. 5, Colon Dep., at 49-50).

By all accounts, Mr. Hunt was in the line to the property cage for property inventory when he fell to the floor.[2]  But there is no testimony regarding what preceded or precipitated his fall. Michelle Maxwell, who was in the property cage at the time, testified:

> When it happened, I was not facing the detainee.  I was retrieving property.  And I heard a loud thud.  It almost sounded like a coconut hitting the ground.  It was extremely loud.  And it drew my attention.

> And I turned around, at which point I noticed the detainee was not in line.  And there was a space where he had been.  And I stepped forward in the property cage and looked down and saw him on the ground.

(Sheriff's Ex. 4, Maxwell Dep., at 56).  Ms. Maxwell said blood was coming from Mr. Hunt's head, and that he was shaking or convulsing as he was lying on the floor.  (Sheriff's Ex. 4, Maxwell Dep., at 55, 59).  She shouted for a medical technician and saw Lena Colon responding.  (Sheriff's Ex. 4, Maxwell Dep., at 61).  Ms. Maxwell left the property cage and cleared the area around Mr. Hunt to allow the medical technicians room to work.  (Sheriff's Ex. 4, Maxwell Dep., at 63).

Ms. Colon, a medical technician on duty at the time, testified that she "remember[ed] hearing a bang on the floor on the side of me and I jumped up and saw blood coming out of [Mr. Hunt's] head and he was having a seizure."  (Sheriff's Ex. 5, Colon Dep., at 26).  He fell near the line at the property cage.  (Sheriff's Ex. 5, Colon Dep., at 29).  There is no dispute that she responded immediately to render medical assistance.  (Shf.St. ¶ 25; Pl.Rsp. ¶ 25).  Mr. Hunt was lying on his

---

[2] Plaintiff argues that Mr. Hunt could not have been in the property line at the time because later on – when evidence technician Thomas Shader photographed Mr. Hunt's body at the morgue – there was no number written on his arm. (Pl.Rsp. ¶ 20; Plaintiff's Ex. 7, Shader Dep, at 36-37).  But, due to the inconsistent nature of processing (which plaintiff concedes), detainees don't always have a number when they get to property inventory. (Sheriff's Ex. 4, Maxwell Dep., at 21-22).  But they must have one before they have their property filed, so if they get to the cage without a number, they are sent back for one. (Sheriff's Ex. 4, Maxwell Dep., at 40; Plaintiff's Ex. 18, at 28-29).  Since Mr. Hunt had not made it to the cage before he fell, it was possible he had no number, but was nevertheless in the property inventory line.

back, so she turned him on his side to keep his airway clear. (Sheriff's Ex. 5, Colon Dep., at 31, 35). Her co-workers followed with equipment. They bandaged his head, fitted him with a cervical collar, secured him to a backboard, and placed him on a stretcher. (Shf.St., ¶ 27; Sheriff's Ex. 5, Colon Dep., at 35, 38-40. Pl.Rsp., ¶ 27; Plaintiff's Ex. 19, Horner Dep., at 9-10). No physician was called, but paramedics were contacted with a report of a 65-year-old man experiencing a seizure; Mr. Hunt was put into an ambulance. (Sheriff's Ex. 5, Colon Dep., at 41; Plaintiff's Ex. 9).

Michael Horner, one of the paramedics from Cermak Health Services who responded to the call from the jail, noted that when they arrived to transport Mr. Hunt to the hospital, the on-scene medical technicians "already had [Mr. Hunt] perfectly packaged for [them] just to switch to [their] stretcher and get out." (Pl.Rsp., ¶ 27; Plaintiff's Ex. 19, Horner Dep., at 9). At that time, Mr. Horner said he didn't recall noticing any seizure activity; but he also said he had no recollection of how Mr. Hunt looked or how he was acting. (*Plaintiff's Additional Facts* ("Pl.St."), ¶ 22; Plaintiff's Ex. 19, Horner Dep., at 13-14). The other responding paramedic, Anthony Loveless, stated that he did not see any seizure activity until Mr. Hunt got to the hospital. (Pl.St. ¶ 22; Plaintiff's Ex., Loveless Dep., at 30-31). That is the only evidence concerning what happened at the time Mr. Hunt fell. Neither party has produced any witnesses who actually saw what happened to cause Mr. Hunt to fall.

Ms. Colon said that Mr. Hunt was transported within five minutes of his fall. (Shf.St., ¶ 32; Sheriff's Ex. 5, Colon Dep., at 47-48). But, according to Ms. Maxwell's written report, Mr. Hunt collapsed at about 6:35 p.m. (Pl.St. ¶ 6; *Sheriff's Response* ("Shf.Rsp."), ¶ 6). According to the paramedic's report, the ambulance from Cermak Health Services was dispatched at about 6:57, arrived at 7:00, and took Mr. Hunt away at 7:03. (Pl.St. ¶ 7, Shf.St. ¶ 7). They arrived at the hospital

6

at 7:09.  (Plaintiff's Ex. 9).  Mr. Hunt was pronounced dead at 8:20 p.m. the following day.  (Shf.St. ¶ 33; Pl.Rsp., ¶ 33).

## C.
## The Expert Opinions

Dr. Michel Humilier of the Cook County Medical Examiner's office performed the post-mortem examination.  There were bruises on the right side of Mr. Hunt's chest; right upper arm, elbow, forearm, wrist, and hand; left upper arm and forearm; right side of back; left groin; above the right eye; and lower lip.  (Plaintiff's Ex. 21).  There was a bruise on the left side of the tongue, the left shoulder, the right buttock, and the left thigh.  (Plaintiff's Ex. 21).  There was also a subgasleal insert spelling  hemorrhage on the right side of the scalp and on the front of the scalp.  (Plaintiff's Ex. 21).

Dr. Humilier concluded that Mr. Hunt died from natural causes: an intracerebral hemorrhage due to hypertensive cardiovascular disease.  (Plaintiff's Ex. 21).  At his deposition, Dr. Humilier explained that these injuries could all be the result of a fall or blow and medical intervention.  (Plaintiff's Ex. 22, at 21-25).  He testified that he had observed these kinds of injuries on victims of falls before, but it was not in his expertise to describe how such falls might occur since he had never witnessed one.  (Plaintiff's Ex. 22, at 21-25).  Internal examination revealed cerebral edema, cerebrovascular artherosclerosis, left ventricular cardiac hypertrophy, coronary artherosclerosis with 75% occlusion of the left anterior descending coronary artery, aortic artherosclerosis, and pulmonary edema.  Dr. Humilier concluded that  Mr. Hunt died from natural causes: an intracerebral hemorrhage due to hypertensive cardiovascular disease.  (Plaintiff's Ex. 21).       D r. G e o r g e Cybulski was the neurosurgeon on call when Mr. Hunt was brought into Stroger Hospital, and he

evaluated Mr. Hunt. (Sheriff's Ex. 11, at 7). In his notes, he indicated that Mr. Hunt was brought

in as the victim of an assault at the jail, but he did not know where he got that information.

(Sheriff's Ex. 11, at 9-10; Plaintiff's Ex. 25).[3] Dr. Cybulski testified that he did not see anything in

his examination that would be inconsistent with seizure activity, and noted that bruising on the

tongue or mouth was a common injury with a seizure. (Sheriff's Ex. 11, at 22). He said that sudden

intracerebral hemorrhage due to hypertensive hemorrhage would usually involve a person blacking

out and falling. (Sheriff's Ex. 11, at 23). A seizure would occur about 20% of the time with an acute

hypertensive episode. (Sheriff's Ex. 11, at 23). When a person has an acute hypertensive episode,

there would not typically be a period of uncontrolled hypertension preceding it. (Sheriff's Ex. 11,

at 23).

Dr. Faran Bhokari was the general surgeon on call at the Stroger Hospital trauma ward when

Mr. Hunt was brought in. (Sheriff's Ex. 12, at 5). He noted that the intake form said Mr. Hunt was

an assault victim, but didn't know where that information came from; he explained that incoming

information like that was wrong about half the time. (Sheriff's Ex. 12, at 41-42). He said the CAT

scan of Mr. Hunt's head was consistent with a hypertensive cardiovascular accident, but that it could

be consistent with a fall or a car crash as well. (Sheriff's Ex. 12, at 42-43). Dr. Bhokari also

---

[3] That statement that the plaintiff had been assaulted is hearsay and inadmissible in a summary judgment proceeding. So too is the doctor's statement reporting that statement. The admissibility of the notes under Rule 803(6), Federal Rules of Evidence, does not make admissible the notation about an assault having occurred. As Dr. Bhokari, the author of the note, testified, he did not know where that information came from and acknowledged that a resident's note reflected that there was no assault. He said notes like this are, in any event, wrong about half the time. (Sheriff's Ex. 12, at 41-43). Thus, the reference to an assault is inadmissible hearsay, even though the hospital records themselves may be admissible under Rule 803(6). Rule 805, the hearsay within hearsay rule, requires that statements within a business record must, themselves, qualify under an exception to the hearsay rule. *See United States v. Christ*, 513 F.3d762, 769 (7th Cir. 2008); *United States v. McIntyre*, 997 F.2d 687 (10th Cir. 1993); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 729 (10th Cir. 1993).

testified that at the time of his death, Mr. Hunt had an increased R and I count, meaning his blood did not clot properly, which in turn would lead to an increased tendency to bruise. (Sheriff's Ex. 12, at 44-45). The final report from Stroger Hospital, which Dr. Bhokari signed, stated "S[tatus] /p[ost] Blunt head trauma." (Plaintiff's Ex. 26, at 1).

The plaintiff hired Dr. Elizabeth Kessler, a board certified neurologist, to review the medical records associated with Mr. Hunt's death.[4] She disagreed with Dr. Humilier's conclusion that Mr. Hunt died of intracerebral hemorrhage:

> First, to know that there was a hypertensive hemorrhage, there would have to be history available of chronic, sustained hypertension, which is lacking in any of these records, including the pathologist's. In addition, while there is bleeding within the brain, there is also extensive evidence of bleeding outside of the brain that could not possibly be accounted for by hypertension or hypertensive hemorrhage. This additional bleeding includes bilateral subdural hematomas with evidence of fresh bleeding between the scalp and the surface of the brain on both sides and large hemorrhages between the scalp and the skull. The pathologist's conclusion also ignores the bruises in many locations over Mr. Hunt's face, arms, legs, groin, buttock and thigh. Even with the pathologist not examining or reporting the results of examination of what would have been pertinent parts of the autopsy, including the nasal cavity, sinuses and occipital laceration, his conclusion does not take into account the many bruises that he describes in his findings.

(Plaintiff's Ex. 10A, at 3). Although conceding she had no evidence regarding what actually happened to Mr. Hunt, Dr. Kessler felt the autopsy report was "consistent only with multiple blunt trauma throughout the body and head" and that Mr. Hunt died from multiple traumatic injuries to the head. (Plaintiff's Ex. 10A, at 3).

---

[4] The Sheriff has moved to strike the reports of plaintiff's medical experts – Drs. Kessler, Kaufman, and Lustgarten – or at least the facts plaintiff bases on them, because their conclusions "fl[y] in the face of the eyewitness testimony that Decedent collapsed from a seizure." (*Defendant's Motion to Strike*, at 12-13). But there is no eyewitness testimony that such was the case. As already noted, neither Ms. Colon nor Ms. Maxwell saw what caused Mr. Hunt to fall; they did not see him until he was already on the ground.

A second doctor hired to review the records, Michael W. Kaufman, board certified in pathology, concluded that while Mr. Hunt could have had an intracerebral hemorrhage, with extension into the cerebral ventricles and subarachnoid space, it would not account for the bilateral subdural hematomas, or the subgaleal hematomas, or injury to the nose and paranasal sinuses. Likewise, he concluded that it would be unlikely that the deep seated hemorrhages in the body musculature as documented by the post-mortem photographs would have been the result of medical intervention:

> There is a great discordancy between the clinical historical information, clinical findings while Mr. Hunt was alive, and the post-mortem autopsy findings, and the ultimate conclusion by Dr. Humilier. It is my opinion that Mr. Hunt sustained a traumatic injury both to his brain, head, and other parts of his body, and that his death was due to non-natural causes. It would be hard to believe that the multitude of injuries, seen both externally as well as internally, including injuries to Mr. Hunt's right maxillary, ethmoid, and sphenoid sinuses, and nasal cavity, as well as bilateral subgaleal and subdural hematomas, could have been caused by a single fall with or without seizure, due to loss of consciousness from hypertensive heart disease. That conclusion is weak, at best. While his heart did weigh slightly more than expected for a man of his weight, the heart's weight was by no means reflective of a significant and longstanding result of hypertension. The lack of renal damage is also confirmatory of that fact. While hypertension may be the cause of an intracerebral hemorrhage, with extension into the cerebral ventricles and subarachnoid space, it would not account for bilateral subdural hematomas, nor subgaleal hematomas, nor injury to the nose and paranasal sinuses. Likewise, the deep seated hemorrhages in the body musculature as documented by the photographs would unlikely be the result of medical intervention.

(Plaintiff's Ex. 11A, at 3). Dr. Kaufman opined that the "only reasonable explanation as to the cause and manner of death of Mr. Hunt would be as a result of a homicide. (Plaintiff's Ex. 11A, at 3). Ignored by him and the other plaintiff's experts were the extensive and critical injuries Mr. Hunt suffered to his face and head only a few months earlier and the fact that his blood values showed

significantly lowered clotting capabilities, which could result in and thus account for extensive bruising from a fall.

Plaintiff's third doctor, Gary Lustgarten, a board-certified neurosurgeon, said he "could not disagree more strongly" that Mr. Hunt suffered a hypertensive intracerebral hemorrhage, because when they occur, they are not associated with acute subdural hemorrhages. (Plaintiff's Ex. 12A, at 5). Dr. Lustgarten said the autopsy results were very consistent with repeated episodes of head and facial injury. (Plaintiff's Ex. 12A, at 5). He said it would be well beyond his imagination and 41 years of experience to relate the injuries to a seizure disorder. (Plaintiff's Ex. 12A, at 5). He noted that Mr. Hunt was not on any anticonvulsant medication, and there was no medical history of such a disorder. (Plaintiff's Ex. 12A, at 5). He also said that in order to relate the hemorrhage to hypertensive cardiovascular disease, one would have to know that Mr. Hunt had a history of chronic, sustained hypertension. (Plaintiff's Ex. 12A, at 5). Dr. Lustgarten said the autopsy report ignored the many bruises and bleeding outside the brain. (Plaintiff's Ex. 12A, at 5). He noted that there were few statements regarding the events prior to Mr. Hunt's transfer to the emergency room, but it was hard to imagine that an accident would be the cause of the multitude of Mr. Hunt's bodily and cerebral injuries. (Plaintiff's Ex. 12A, at 5).

Dr. Lustgarten thought "that Mr. Hunt died from multiple traumatic injuries to the head and not hypertension." (Plaintiff's Ex. 12A, at 5). He added that he thought Mr. Hunt's injuries were inflicted by one or more individuals. (Plaintiff's Ex. 12A, at 4). The only opinions plaintiff gleans from her experts are that "Mr. Hunt died from multiple traumatic injuries to the head;" that he "sustained a traumatic injury to his brain and head and other parts of his body, an his death was due to non-natural causes;" and that "he died of multi trauma with the fatal injury being a traumatic brain

injury that led to his death." (Pl.St., ¶¶ 27-29). It should be noted that despite their obvious relevance here, none of the three physicians considered Mr. Hunt's medical history regarding the severe, multiple traumatic injuries to his head, the skull fracture, and the extensive injuries to his face suffered in his drunken fall a few months prior to his arrest. (Plaintiff's Exs. 10A, at 1; 11A, at 2; 12A, at 1). This failure to have considered this rather significant history means either that the information was not provided to the experts or that they simply chose to put it out of view. The result is the same in this case, as discussed *infra* at insert

The remaining evidence offered by the plaintiff is a 2008 letter from the Department of Justice (DOJ letter) to the Sheriff and the Cook County Board president regarding conditions at Cook County jail, and the report of yet another expert, Victor Lofgreen. In its ninety-eight pages, the DOJ letter did not have many good things to say about the Cook County jail.[5] The plaintiff mines just a few nuggets from the letter. First, he points out that the letter states that detainees confined at the jail are not adequately protected from harm, including physical harm from excessive use of force by staff and assaults from fellow detainees due to inadequate supervision. (Pl. St., ¶ 41). The DOJ letter also found that the jail "fails to provide adequate emergency care" and chastised the administration for an incident in July 2007, where an ambulance and emergency medical technicians

---

[5] The Sheriff initially argued that the DOJ letter is inadmissible because it is irrelevant, violates the hearsay rule, and was not disclosed during discovery. The latter argument is inaccurate (Dkt. #171, Ex. 2), and has been abandoned by the Sheriff. The other arguments need not be resolved because, as will become clear, the DOJ letter does not enter into the calculus. It should be noted, however, that both parties' submissions on the admissibility issue tend to gloss over the factors that go into a Fed.R.Evid. 803(8)(C) analysis. And the briefs of neither party address the various cases that have dealt with the issue of admissibility of exactly these types of DOJ letters. *See, e.g., Shepherd v. Dallas County*, 591 F.3d 445, 456-457 (5th Cir. 2009); *Bonilla v. Jaronczyk*, 354 Fed.Appx. 579, 582, 2009 WL 4282000, *2 (2nd Cir. 2009); *Roland v. Johnson*, 1991 WL 84346, *2 (6th Cir. 1991); *Wilks v. Stowers*, 2010 WL 2104153, *9 (W.D.Wash. 2010); *Johnson v. Baker*, 2009 WL 3486000, *2 -3 (W.D.Ky. 2009).

took fifteen minutes to arrive (Pl. St., ¶ 43), although it's not entirely clear how the response time of an outside ambulance would be the fault of the Cook County jail.  The DOJ letter noted that a:

> pattern of inappropriate and excessive use of force . . . throughout the CCJ divisions, ... an especially high number of abuse of force allegations do emerge from the CCJ's RCDC intake unit" and that "the RCDC is chronically overcrowded, cramped, chaotic and insufficiently staffed. The impact of these conditions on the use of force is considerable.

(Pl. St., ¶ 44).  The letter also found that there were attempts by officers or other staff at the CCJ to conceal the inappropriate or excessive use of force. (Pl. St., ¶45).

Mr. Lofgreen reviewed all the evidence in this case on the plaintiff's behalf and came to the following conclusions:

> Cook County Jail officers routinely caused injury or harm to detainees or allowed detainees to assault each other and routinely failed or refused to seek medical attention for detainees who were injured at the hands of officers and/or other Cook County Jail detainees.  (Pl.St., ¶ 47).

> The Cook County Department of Corrections knew that the assaults were occurring and knew that officers were failing or refusing to seek medical attention for injured detainees, yet allowed deficiencies in training and supervision to exist, without correction attempts let alone correction, for such an extended period of time that they became the customs, practices or policies of the department.  (Pl.St., ¶ 48).

> Mr. Hunt's assault and death was caused by these customs, practices or policies of allowing assaults on inmates by corrections officers or other inmates to occur and failing to provide medical care.  (Pl.St., ¶ 49).

> The assault on Mr. Hunt was directly related to the management failures to adequately select, train, manage, revise policy and supervise the officers of the RCDC Unit of the Cook County Jail. The culture of violence and 'code of silence' at the CCDOC provided a ripe environment for these improperly trained and poorly supervised officers to either assault Mr.Hunt or allow another inmate to assault Mr. Hunt. The lack of training and supervision of officers present extended beyond the assault to the medical response and investigation of this event. Both were inadequate as well. (Pl.St., ¶ 50).

Mr. Lofgreen's conclusion that Mr. Hunt was assaulted is based on two determinations. The first was that Ms. Maxwell was not credible when she testified that she heard a thud and turned to see Mr. Hunt on the floor because the intake area "is a crowded, noisy area." Mr. Lofgreen said he didn't believe that Officer Maxwell heard one person – Thomas Hunt – fall despite the crowded and noisy conditions." (Plaintiff's Ex. 27A, at 7). He also thought it was "highly coincidental" that a medical technician, Ms. Colon, was right there. (Plaintiff's Ex. 27A, at 7-8). The deficiencies in Mr. Lofgreen's conclusions are several and obvious – and troubling.

A fundamental premise of our system of trial in both civil and criminal cases is that determining the weight and credibility of witness testimony is for the jury, who are presumed to be fitted for the task by their natural intelligence and their practical knowledge of the affairs of life. *United States v. Scheffer,* 523 U.S. 303, 313 (1998). It is this premise that underlies the principle that a witness's credibility is "not an appropriate subject matter for expert testimony." *United States v. Welch,* 368 F.3d 970, 975 (7th Cir.2004); *Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000); *United States v. Vest*, 116 F.3d 1179, 1185 (7th Cir. 1997); 3 Weinstein's Federal Evidence ¶704[02] at 704-15 (1996). Yet that is precisely what Mr. Lofgreen has openly done.

Mr. Lofgreen was not present and his claimed expertise does not permit him to speculate about the noise levels in the jail at the time of the incident and whether they prevented Miss Coleman from hearing the thud she testified she heard. Apart from Mr. Lofgreen's speculation, there is no evidence to undermine her testimony or that of Ms. Maxwell. Speculation is not the function of an expert. *Metavante Corp. v. Emigrant Sav. Bank*, – F.3d –, –, 2010 WL 3385961, *8 (7th Cir. 2010).

The second determination underlying Mr. Lofgreen's conclusions was the fact that there was no number written on Mr. Hunt's arm, meaning that he could not have proceeded to the area where

14

his collapse supposedly had taken place. (Plaintiff's Ex. 27A, at 8). As the foregoing discussion of the evidence demonstrates, however, that is not necessarily the case. So really, Mr. Lofgreen provides no valid support for his determination that Mr. Hunt was assaulted, and his conclusions are not reliable and would be of no help to the jury. Finally, Mr. Lofgreen provides no support for his ultimate conclusion that the inadequacies discussed in the DOJ letter led directly to Mr. Hunt's death. As is explained in the analysis section, *infra*, the evidence of record – or more accurately, the absence of any evidence that Mr. Hunt was beaten by a guard or inmate – makes it impossible to draw that conclusion logically.

A court "must ensure that the expert testimony at issue "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597(1993); *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc.* 493 F.3d 782, 787 (7th Cir. 2007). Expert testimony is inadmissible when based on speculation and argument unsupported by evidence. *Goodwin,*, 232 F.3d at, 608 (7th Cir. 2000). That is what Mr. Lofgreen's report consists of. "It is full of vigorous assertion...carefully tailored to support plaintiffs' position but devoid of analysis." *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997).

## II.
## ANALYSIS
### A.
### Summary Judgment Standards

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering

a motion for summary judgment, the nonmoving party's evidence "'is to be believed, and all

justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552

(1990). Credibility determinations must be left for the fact-finder. *Id.* at 552.

But this favor toward the nonmoving party does not extend to drawing "[i]nferences that are

supported by only speculation or conjecture." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir.

2008). The nonmoving party "must do more than raise some metaphysical doubt as to the material

facts; [it] must come forward with specific facts showing that there is a genuine issue for trial." *Keri

v. Bd. of Trs. of Purdue Univ.,* 458 F.3d 620, 628 (7th Cir.2006). Where the nonmoving party bears

the burden of proof at trial, it must present specific facts showing a genuine issue to survive

summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Ortiz v. John O. Butler

Co.,* 94 F.3d 1121, 1124 (7th Cir.1996)("If the nonmoving party fails to establish the existence of

an element essential to his case, one on which he would bear the burden of proof at trial, summary

judgment must be granted to the moving party."). A genuine issue of material fact exists, precluding

summary judgment, "only if sufficient evidence favoring the nonmoving party exists to permit a jury

to return a verdict for that party." *Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir. 2007).

To be admissible in a summary judgment proceeding, the evidence submitted by a party in

support of or in opposition to the summary judgment motion must be admissible at trial. *See* Rule

56(e); *Tindle v. Pulte Home Corp.,* 607 F.3d 494 (7th Cir.2010). Allegations in a complaint are not

evidence. *Article II Gun Shop, Inc. v. Gonzales,* 441 F.3d 492, 496 (7th Cir. 2006); *Eisenstadt v.

Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997); 10A Charles Alan Wright et al., *Federal Practice

& Procedure* § 2722, at 379-80 & 382-84 (1998). Documents must be authenticated by and attached

to an affidavit that meets the requirements of Rule 56(e), and the affiant must be a person through whom the exhibits could be admitted into evidence. *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006); 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2722, at 379-80 & 382-84 (1998)). Finally, conclusory statements without supporting facts are insufficient to establish a factual dispute that will defeat summary judgment. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990); *Alexander v. CareSource,* 576 F.3d 551, 560 (6th Cir. 2009). The rule applies to experts as well as non-expert witnesses and parties. *Weigel v. Target Stores,* 122 F.3d 461, 468-469 (7th Cir.1997)("'The fact that a party opposing summary judgment has some admissible evidence does not preclude summary judgment. We and other courts have so held with specific reference to an expert's conclusional statements.'"); *Thomas v. Christ Hosp. and Medical Center,* 328 F.3d 890, 894 (7th Cir.2003); *Ner Tamid Congregation of North Town v. Krivoruchko,* 638 F.Supp.2d 913, 925 (N.D.Ill. 2009).

It is not that such statements are self-serving. *See Gilles v. Blanchard,* 477 F.3d 466 (7th Cir.2007). All testimony is self-serving, and summary judgment principles do not require that everything asserted by a party be corroborated. Otherwise, the burden of proof in summary judgment would effectively be greater than that in criminal cases, which allow a defendant to be convicted on the *uncorroborated* testimony of even a convicted felon. See *Maher v. City of Chicago,* 406 F.Supp.2d 1006, 1014-15 (N.D.Ill.2006). Indeed, as Learned Hand explained there is no principle of law precluding evidence on the ground that it is self-serving. *United States v. Matot,* 146 F.2d 197, 198 (2nd Cir. l944). *See also Wilson v. McRae's, Inc.,* 413 F.3d 692, 694 (7th Cir.2005); *Dalton v. Battaglia,* 402 F.3d 729, 734-35 (7th Cir.2005); *Rogan v. Allied Tube & Conduit Corp.*, 2010 WL 1032422, 9 (N.D.Ill. 2010); Maher, 406 F.Supp.2d at 1014-15 (collecting cases). The Seventh Circuit

17

has repeatedly made clear that testimony by a parties or witnesses reporting what they saw or did or heard or said (assuming that the hearsay or some other evidentiary rule does not otherwise bar admissibility) need not be corroborated and may be sufficient to raise an issue of material fact. *See e.g., Montgomery v. American Airlines*, _F.3d_, 2010 WL 4670173 (7th Cir. 2010); *Berry v. Chicago Transit Authority,* 2010 WL 3294720, 3 (7th Cir. 2010).

**B.**

There is no eyewitness account of what caused Mr. Hunt to collapse. Despite access to lists of witnesses to the incident, the existence of a roster of Cook County Correctional officers working at the time of the incident, and all pertinent reports, plaintiff has been unable to identify any individual that might have been responsible for or has any knowledge of what plaintiff claims was an attack on Mr. Hunt. Despite lengthy discovery and ample opportunity to do so, plaintiff did not depose, or even seek written discovery from, any of the individual officers who may have been had relevant information until about a year after being informed of the officers working at the time. *See Hunt v. Dart*, 612 F.Supp.2d 969, 978-80 (N.D.Ill. 2009). So what is left is a §1983 claim without any individuals actors identified and without any direct evidence of what happened to the deceased. It is simply a claim under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978) that the Sheriff had customs or policies under which Cook County Correctional officers were allowed to routinely cause serious injury to detainees, under which Cook County Correctional officers routinely allowed detainees to cause serious injury to their fellow detainees, and under which Cook County Correctional officers routinely failed or refused to seek medical attention for detainees injured as a result.

18

This is simply not enough under basic summary judgment principles, which do not allow speculation to substitute for proof. This principle is not unique to summary judgment proceedings. In all contexts, "the idea that speculation can be employed as a substitute for proof" "has long [been] reject[ed]." *United States v. Landry,* 257 F.2d 425,431 (7th Cir.1958). *Accord In re Cohen,* 507 F.3d 610, 614 (7th Cir.2007) (speculation is not evidence); *Lauth v. McCollum,* 424 F.3d 631, 634 (7th Cir. 2005)(Posner, J.)("hypothesis is not proof"). "The trouble with absence of evidence is that it is consistent with *any* hypothesis."*United States v. Holland*, 445 F.2d 701, 793 (D.C.Cir.1971) (Emphasis in original). For the Sheriff, the fact that the plaintiff cannot identify Mr. Hunt's attacker or attackers – plaintiff can't even guess as to whether they were officers or fellow detainees – sounds the death knell for plaintiff's claim.

 In *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), the Supreme Court held that in order for a *Monell* claim to succeed an individual must have suffered a constitutional injury:

> neither *Monell* . . . , nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

475 U.S. at 799. From there, the defendant argues that since the plaintiff hasn't identified any responsible individuals, there can be no constitutional injury and no *Monell* claim. But there are situations in which a *Monell* claim can be maintained even when there are no liable officers. An officer might plead qualified immunity as a defense. If successful, it could be found that a "plaintiff's constitutional rights were indeed violated, but that the officer could not be held liable.

In [such a] case, one can still argue that the . . . policies caused the harm, even if the officer was not individually culpable." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 304 (7ᵗʰ Cir. 2010).

In *Thomas*, which was a failure-to-provide-medical-treatment case, the jury found the County liable even though it found the medical technicians were not. The court supposed that:

> the jury could have found that the CMTs were not *deliberately indifferent* to Smith's medical needs, but simply could not respond adequately because of the well-documented breakdowns in the County's policies for retrieving medical request forms. It is not difficult to reconcile the verdicts in this instance, and we see nothing amiss in holding the County liable even though none of the CMTs were individually responsible.

604 F.3d at 305. The Seventh Circuit rejected the County's championing of a rule that would require individual liability before there could be municipal liability in light of just such potentialities. *Id*. F.3d at 305. The actual rule to be derived from *Heller*, the court explained, was "much narrower: a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Id*.at 305 (emphasis in original).

## C.

The question then becomes whether there was a constitutional injury – or more accurately, whether plaintiff can prove Mr. Hunt suffered a constitutional injury – even though there is no evidence of who, if anyone, caused Mr. Hunt to collapse. We begin with the plaintiff's excessive force claim. The first step in the analysis is identifying the specific constitutional right allegedly infringed by the challenged application of force. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Mr. Hunt was a pretrial detainee – he had already been arrested, but was not yet a prisoner in the sense that his guilt had not been adjudicated. *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1040 (7ᵗʰ Cir. 1998). Prisoners' rights are guaranteed by the Eighth Amendment; they are protected only from the

infliction of cruel and usual punishment. *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009); *Payne*, 161 F.3d at 1040 (7th Cir. 1998). Pretrial detainee are not "punishable"; their rights are guaranteed by the Fourteenth Amendment. *Lewis*, 581 F.3d at 473; *Payne*, 161 F.3d at 1040. Beyond the fact that this protection is *at least* as strong as that provided by the Eighth Amendment, *Payne*, 161 F.3d at 1040, just what that means in terms of an excessive force claim, the Seventh Circuit has not explained.

In the context of a medical needs claim, the court has said that the Fourteenth Amendment analysis is identical to the Eighth Amendment analysis. *Lewis*, 581 F.3d at 473; *Williams v. Rodriguez,* 509 F.3d 392, 401 (7th Cir.2007); *Guzman v. Sheahan,* 495 F.3d 852, 856-57 (7th Cir.2007). But in the case of an excessive force claim, things get dicey. *Lewis* explained that "the Due Process Clause, which prohibits all "punishment," affords broader protection than the Eighth Amendment's protection against only punishment that is 'cruel and unusual.'" 581 F.3d at 474. The court conceded that the contours of this broader protection remain undefined, but said that the appropriate source of the constitutional right at issue had to be identified anyway under *Graham*. *Id*. at 474. The court found it unnecessary to go further because the *pro se* plaintiff argued that Eighth Amendment protection applied:

> As we have made clear, anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment. Thus, we conclude that although we must evaluate [plaintiff's] claims under what we believe is the proper basis-here, the Fourteenth Amendment-we will do so only insofar as the alleged conduct would have violated the Eighth Amendment as well; we will not consider any safeguards the Fourteenth Amendment provides beyond those it shares with the Eighth Amendment. [Plaintiff] has argued only for these more limited protections.

*Id.* at 475.

21

In the instant case, the plaintiff's submission does not attempt to define the appropriate standard. Indeed, the supporting memorandum cites no case law on the subject. The Sheriff's brief relies on cases applying the Eighth Amendment standard in the prisoner context, citing *Hudson v. McMillian*, 503 U.S. 1 (1992) and *Harper v. Albert*, 400 F.3d 1052 (7th Cir. 2005), but does not mention the distinction between prisoners and pretrial detainees. In *Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005), a case that arose out of the death of a pretrial detainee at the hands of sheriff's deputies at a county jail, the court simply said since the decedent "was a pretrial detainee in the jail at the time of his death in custody, the plaintiffs' claim falls within the Fourteenth Amendment." The court went on to say that it had previously noted that in this context "a Fourteenth Amendment claim is evaluated by the same legal standards as an Eighth Amendment claim." *Id*. at 758.

More recently, in *Forrest v. Prine*, 620 F.3d 739 (7th Cir. 2010), the court followed a tack similar to its approach in *Lewis*, but eschewed the niceties of the distinction between prisoners and pretrial detainees and Eighth and Fourteenth Amendment protections. Like the court in *Lewis*, it placed the burden on the plaintiff to demonstrate that a greater protection than the Eighth Amendment provided was warranted:

> The Fourteenth Amendment right to due process provides at least as much, and probably more, protection against punishment as does the Eighth Amendment's ban on cruel and unusual punishment. [Plaintiff] has not explained, however, how any protections guaranteed by the Fourteenth Amendment provide him with more protection than he would receive under traditional Eighth Amendment standards. We therefore shall borrow Eighth Amendment standards to analyze [plaintiff's] Fourteenth Amendment section 1983 claim.

*Id*. at 744 (citations omitted).

Since the plaintiff does not argue otherwise or explain what the extended protections might be, we shall follow *Forrests* and borrow Eighth Amendment standards to analyze plaintiff's Fourteenth Amendment §1983 claim. Consequently, for the plaintiff to succeed on the excessive force claim, he must demonstrate that the unidentified Cook County Correctional officers acted "maliciously and sadistically" to cause Mr. Hunt harm. *Wilkins v. Gaddy*, – U.S. –, – , 130 S.Ct. 1175, 1178 (2010); *Forrest, supra*; *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009). Several factors guide the inquiry of whether an officer's use of force was legitimate or malicious, including "the need for an application of force, the relationship between that need and the force applied, the threat reasonably perceived by the responsible officers, the efforts made to temper the severity of the force employed, and the extent of the injury suffered by the prisoner." *Hudson*, 503 U.S. at 7; *Forrest*, supra; *Hendrickson*, 589 F.3d at 890; *Lewis*, 581 F.3d at 478. The accused officer's mental state during the incident, of course, is a key factor in the calculus. *Lewis*, 581 F.3d at 477-78. As the court said in *Santiago v. Walls*, 599 F.3d 749, 762 (7th Cir. 2010), an excessive force claim "require[s] that [plaintiff] present relevant and probative evidence about the state of mind of the defendants."

Without identifying any responsible officer, or providing any admissible evidence regarding what happened to Mr. Hunt or what Mr. Hunt or any officers in the vicinity were doing at the time of Mr. Hunt's collapse, the plaintiff cannot possibly stave off summary judgment on the excessive force claim. There is no way to assess the phantom officer's mental state or the circumstances of the purported use of excessive force. Plaintiff was earlier able to withstand a motion to dismiss premised on this very basis, simply because the time had not yet come to present evidence. It has now. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007)(". . . we have consistently held that

23

summary judgment is . . . the put up or shut up moment in a lawsuit . . . ."). The plaintiff's failure

is fatal to his claim, as the court in *Harper* made clear:

> The problem [plaintiff] faces, and has faced throughout the factual and legal
> presentation of the case, is that he has failed to identify any individual guards that
> violated his constitutional rights with the use of excessive force at any point during
> the transfer. More importantly, as to this appeal he has likewise failed to identify any
> particular officer who harmed him as he was being transferred from the strip-search
> area to the segregation unit in the North Cellhouse. In order for courts to satisfy the
> mandate to inquire into the state of mind of prison officials who have allegedly
> caused a constitutional violation, . . . it is most imperative that we are provided with
> "identified culprits"; for "[w]ithout minds to examine, we cannot conduct an
> individualized inquiry." It was [plaintiff's] burden to identify, . . . through discovery,
> . . . those guards that allegedly violated his constitutional rights during the time frame
> in question . . . .

400 F.3d at 1065-66.

Plaintiff's argument seems to go like this: Mr. Hunt died while he was in the custody of the

Sheriff of Cook County. Plaintiff's experts disagree with the County's medical examiner and say

his death was not due to natural causes, but due to multiple blunt force traumas. Based on this, it

is argued, "there is overwhelming evidence from which it can be reasonably inferred that Hunt

suffered a fatal blow to the head in the course of an assault perpetrated either by a correctional officer

or another detainee." (*Plaintiff's Brief in Opposition*, at 9). As the Sheriff points out, in essence,

this is a *res ipsa loquitur* theory of liability. Under that ancient doctrine – "the thing speaks for

itself" – the manner in which an incident occurred permits an inference that it was caused by the

defendant's negligence. *Sweeney v. Erving*, 228 U.S. 233, 238-39 (1913); *Aguirre v. Turner Const.

Co.*, 582 F.3d 808, 810-11 (7th Cir. 2009). But the doctrine is confined to negligence cases, *Aguirre*,

582 F.3d at 810-11 (7th Cir. 2009), and this is a constitutional tort case in which the plaintiff must

prove intent. *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)("[L]iability for negligently

inflicted harm is categorically beneath the threshold of constitutional due process."). "[T]he mere fact that an injury occurred while an individual was in . . . custody is not sufficient to avoid summary judgment – a plaintiff must identify the specific unreasonable conduct that caused his or her injuries." *Abdullahi v. City of Madison*, 423 F.3d 763, 770-71 (7th Cir. 2005).

The opinions of the plaintiff's medical experts that death did not come from natural causes but from trauma to the head resulting from an assault does not create a material issue of fact. An expert's role in our adversary system requires evaluation of all relevant and significant data. *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir.1977) (excluding expert testimony for failure to consider important factors).; *MDG International, Inc. v. Australian Gold, Inc*., 2009 WL 1916728, 4 (S.D.Ind.2009); *In re Brand Name Prescription Drugs Antitrust Litigation,*, 1996 WL 351178 (N.D.Ill.1996). Indeed in some (but by no means all) cases, an expert's failure to consider other potential causes of plaintiff's injury before offering an opinion renders his testimony unreliable and inadmissible . *McNabney v. Lab. Corp. of Am.,* 153 F. App' x 293, 295 (5th Cir.2005); *Holloway v. Ameristar Casino St. Charles, Inc*. 2009 WL 5169535, 4 (E.D.Mo.2009). That is the situation here.

Despite its obvious significance, the plaintiff's experts did not consider the fact that five months before he died, the plaintiff had fallen while drunk. That fall had resulted in extremely serious injuries to the plaintiff's brain and skull and face: he suffered a skull fracture, traumatic brain injury, facial fracture, aphasia, and impaired cognition. (Shf.St. ¶ 59; Pl.Rsp. ¶ 59).[6] He spent two

---

[6]Aphasia is a disorder that results from damage to portions of the brain that are responsible for language. For most people, these are areas on the left side (hemisphere) of the brain. Aphasia usually occurs suddenly, often as the result of a stroke or head injury. The disorder impairs the expression and understanding of language
(continued...)

weeks in the rehabilitation unit at Advocate Christ Medical Center and was discharged May 11th. (Sheriff's Ex. 25).[7] Following his release from the hospital, he suffered intermittent fainting spells. (Shf.St. ¶ 61; Pl.Rsp. ¶ 61). Yet, none of this was considered by the plaintiff's experts in concluding that his injuries could only have come from an assault. (Dr. Kaufman opined that the "only reasonable explanation as to the cause and manner of death of Mr. Hunt would be as a result of a homicide."). Nor did they consider the heightened probability of bruising given the plaintiff's blood values, which showed significantly lowered anticoagulation capacity, which in turn would result in bruising from falls – either the fall in the Jail or perhaps other falls that had occurred before the arrest. After all, Plaintiff had had spells of intermittent fainting from his fall a few months earlier. Had the experts considered these critical factors and rejected their possible causal relationship to death, bruising etc., a different situation might be presented. But that did not occur. Here, the experts' conclusion that the plaintiff's injuries could only have come from an assault at the jail is hopelessly speculative, and of course, expert opinion must have an analytically sound basis so that it is not speculation in disguise. *Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir.2000).

### D.

The same line of reasoning applies to plaintiff's claim that the Sheriff's officers stood idly by while Mr. Hunt was beaten by one or more detainees. There is no direct or circumstantial evidence that this occurred. Plaintiff had the opportunity to depose literally hundreds of witnesses

---

[6](...continued)
as well as reading and writing.

[7] Mr. Hunt was hospitalized from April 27th to May 11th. That is two weeks, not "several weeks" as the Sheriff asserts and plaintiff, for whatever reason, concedes. (Shf.St. ¶ 60; Pl.Rsp. ¶ 60).

(Dkt. #105).[8] She was unable to find anyone who claimed to have witnessed Mr. Hunt being attacked. Indeed, perusing the depositions of the only two witnesses to Mr. Hunt's collapse in the record – Ms. Colon and Ms. Maxwell – it doesn't appear that plaintiff's counsel even asked them whether they witnessed an attack or the aftermath of one, such as detainees standing over Mr. Hunt or perhaps dispersing hurriedly from the scene – and that would have to have occurred if a detainee had been the assailant. Plaintiff certainly does not point to any such line of questioning in her brief or Local Rule 56.1 submissions. As already noted, the plaintiff can't employ *res ipsa loquitur* to prove her case, because negligence is not enough. The level of culpability that plaintiff has to show is deliberate indifference toward a substantial risk of serious injury to Mr. Hunt, along with a subsequent failure to take appropriate steps to protect him from that danger. *See Farmer v. Brennan,* 511 U.S. 825, 847 (1994); *Klebanowski v. Sheahan,* 540 F.3d 633, 637 (7th Cir.2008); *Guzman v. Sheahan,* 495 F.3d 852, 857 (7th Cir.2007).

Here, there is no evidence of a threat to which the guards or anyone else could have responded. Had the plaintiff been assaulted, only mere seconds would have elapsed from the time of the assault and the loud thud resulting from his head striking the floor.[9] Had a detainee been responsible for the plaintiff's situation, there would not have been enough any time for him to have

---

[8] At a motion hearing on May 1, 2009, "plaintiff's counsel stated candidly that even as of [that] date and having taken the discover[y] of the individual officers and other personnel who may have had knowledge of plaintiff's son's death, the plaintiff still did not know who might have been responsible . . . ." Defendant's counsel informed the court that "the names of approximately 300 individuals at the jail who might have had knowledge of the circumstances surrounding Mr. Hunt's death had been provided to the plaintiff in discovery." [Dkt. #105].

[9] Given the testimony, it is a reasonable inference that the sound was made when the plaintiff's head struck the floor. That would be consistent with the medical evidence of the subdural hematomas, which the plaintiff's physician said could not have been the result of a hypertensive episode.

gotten back into line without Ms. Maxwell and Ms. Colon noticing something was amiss since they looked up immediately upon hearing the thud. The evidence is undisputed, however, that there was nothing amiss other than Mr. Hunt having struck the ground. Hence, if the plaintiff had in fact been assaulted by another detainee, it is a reasonable inference – perhaps the only inference – that the assailant must have been standing in line next to the plaintiff. But in that case, there is nothing to support the contention that the guards were in any position to have prevented what occurred or were indifferent to the plaintiff's safety. Phrased differently, there is no evidence that the guards were forewarned of danger to the plaintiff and were indifferent to it.

The ultimate measure of the adequacy of a response, or lack thereof, to an attack, is reasonableness in light of the surrounding circumstances. *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Compare ("[T]he character of every act depends on the circumstances in which it is done."). *Schenck v. United States*, 249 U.S. 47 (1919)(Holmes, J.). If there is no evidence of any attack at all, the reasonableness of a correctional officer's response – or lack thereof – cannot be gauged. Indeed, the inquiry about reasonableness becomes irrelevant. Perhaps the attack simply happened too quickly – and that is the only conclusion that the evidence allows even assuming that an attack by a detainee occurred. In that event, the first possible intervention was that of the medical technician immediately after Mr.Hunt collapsed.

The plaintiff's submission fails to address any of these insufficiencies. Instead, it relies entirely on a single paragraph from the DOJ's ninety-eight-page report on conditions at Cook County Jail:

> Insufficient inmate supervision has been a serious problem at CCJ for decades. Inmate supervision is seriously compromised by chronic overcrowding and understaffing. The federal district court monitoring the *Durall* Consent Decree has

> repeatedly cited CCJ for failing to provide adequate security staff to ensure safe and
> secure conditions at the facility. In September 2006, then-Sheriff Michael Sheehan
> [sic] admitted that the Jail is 'severely understaffed.'

(*Plaintiff's Brief In Opposition*, at13).  The first difficulty with reliance on the DOJ's report is that

the plaintiff's brief cites to paragraph 42 of its Local Rule 56.1 submission, which in turn directs the

court to page 3 of plaintiff's exhibit 6.  The above paragraph does not appear anywhere on page 3.

As already noted, the exhibit is ninety-eight pages long.  An inaccurate citation to a lengthy exhibit

is no better than no citation at all.  The Seventh Circuit has made clear over and over that a district

court does not have to review a lengthy exhibit in order to find something that lends support to a

plaintiff's case.  *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 818 (7th Cir. 2004).

"Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927

F.2d 955, 956 (7th Cir.1991).  *See also Gates v. Caterpillar, Inc.,* 513 F.3d 680, 688 n. 4 (7th

Cir.2008); *Corley v. Rosewood Care Center, Inc. of Peoria,* 388 F.3d 990, 1001 (7th Cir.2004);

*Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois,* 424 F.3d 659, 664 (7th Cir.2005);

*Albrechtsen v. Board of Regents of University of Wisconsin System,* 309 F.3d 433, 436 (7th

Cir.2002); *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir.1999) ("A brief must make all

arguments accessible to the judges, rather than ask them to play archaeologist with the record.").

It is simply not a district judge's job in summary judgment cases to sift through the record and make

the case for a party. *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.

2010).

Even assuming the paragraph does appear somewhere in the report, and the jail was

understaffed, the plaintiff's argument – that because there was understaffing at the jail at the time

the report referred to -- the Sheriff condoned a policy of inadequate detainee protection is not enough

to stave off summary judgment. It is a theory of liability that the Seventh Circuit has recently

rejected in *Thomas* – a case involving a death at the Cook County Jail:

> The theory that understaffing may have also caused [decedent's] death, on the other
> hand, is too remote to support a verdict against the Sheriff. A governmental body's
> policies must be the *moving* force behind the constitutional violation before we can
> impose liability under *Monell*. In § 1983 actions, the Supreme Court has been
> especially concerned with the broad application of causation principles in a way that
> would render municipalities vicariously liable for their officers' actions. That is why
> some courts distinguish between the acts that caused the injury and those that were
> merely contributing factors.

604 F.3d at 306 (emphasis in original)(citations omitted). The court went on to say that it did not

need to make such a distinction in *Thomas* because the plaintiff there presented no evidence that

demonstrated that the actions – or inactions – of the officers in that case had anything to do with

understaffing. *Id.* at 306.[10] There is no such evidence here, either.

As in *Thomas*, "[n]o one testified or even argued that the officers would [or could] have acted

differently if more of them were on duty." All the plaintiff presents is the paragraph purportedly

from the DOJ report, and the report of her expert, Victor Lofgreen. Forgetting for the moment that

Mr. Lofgreen's report is inadmissible under *Daubert*, it is nevertheless clear that, at least in the

portions upon which plaintiff relies, Mr. Lofgreen never opines that understaffing caused Mr. Hunt's

death. Instead, he speculates that Cook County correctional officers were inadequately trained and

---

[10] The court also rejected a similar jail understaffing theory of liability against a correctional center warden
in an unpublished opinion, *Hannah v. Gilmore*, 1996 WL 637674 (7th Cir. 1996). The court explained that,
while a policy adopted by prison officials could violate the Eighth Amendment, the policy would had to have
been adopted with the subjective intent to inflict harm. 1996 WL 637674, *2.

supervised, and this caused injuries to Mr. Hunt. (Pl.St., ¶ ¶ 47-50; Plaintiff's Ex. 27, ¶¶ 4, 5, 7).
Whether admissible or not, that says nothing about whether understaffing was the *moving force*
behind Mr. Hunt's death.

But even accepting that unsupported premise that Mr. Hunt was, indeed, beaten by a fellow
detainee or detainees, and this led to his death, it is still quite a jump to the conclusion that the
tragedy was a direct result of some policy on the part of the Sheriff or even purported understaffing.
Let's further assume that there was an officer or officers in the vicinity. The plaintiff would still
have to come up with some evidence as to whether and when they were alerted to the attack, how
many guards were in the vicinity, and how long they had to respond before the attack was over. In
such circumstances, an immediate intervention is not necessary, and a guard need not act alone. In
*Guzman v. Sheahan,* 495 F.3d 852, 857-59 (7th Cir. 2007), the corrections officer saw the plaintiff,
a pretrial detainee, being punched and hit in the head with a broom by a fellow detainee. The
Seventh Circuit upheld summary judgment for the defendant, finding that the officer was not
deliberately indifferent to the detainee's safety when she did not intervene immediately, but left her
post for about three minutes in search of backup. *Id.* at 853-54, 858-59.

Or, one could suppose that there was a guard or two in the vicinity, but that they deliberately
determined not to intervene. They could have done so regardless of any policy of understaffing on
the Sheriff's part. The plaintiff has no evidence that would allow a fact-finder to make a conclusion
either way that was anything more than a guess. Understaffing wouldn't even enter into the calculus
if a corrections officer or officers acted on their own. The plaintiff here has no evidence as to where
any officers were, what they did or might or could have done, and what their motivation might have
been. As the court asked in *Thomas*, "[h]ow many officers would the Sheriff need to hire to ensure

31

that no one deliberately ignores a [situation]?" 604 F.3d at 306 -307. The jail could be understaffed or overstaffed, and if an officer decided on his own not to intervene in an attack, the attack would not be the direct result of any policy.

Simply put, without any evidence from the plaintiff as to what actually did happen, her case is all hypotheticals, speculation, and conjecture, and those are inadequate to defeat a motion for summary judgment. *Trentadue v. Redmon*, – F.3d –, –, 2010 WL 3239397, *3 (7th Cir. 2010); *Gunville v. Walker*, 583 F.3d 979, 986 (7th Cir. 2009). We simply cannot take the leap from Mr. Hunt collapsing and later dying with multiple bruises on his body to an unconstitutional policy of understaffing – or any policy – on the part of the Sheriff without more from plaintiff to fill in the gap. This is especially true in light of the extensive injuries suffered by the plaintiff five months earlier which resulted in traumatic brain injury, skull fracture, facial fracture, aphasia, and impaired cognition. The Sheriff is entitled to summary judgment on plaintiff's failure to intervene claim.

### E.

Plaintiff's remaining theory of §1983 liability is the claim that Cook County Correctional officers failed or refused to seek medical attention for Mr. Hunt. Because there is no dispute that on-scene medical technicians responded immediately to Mr. Hunt's crisis, plaintiff focuses on what, according to the paramedics' log, appears to have been a twenty-two minute delay in calling the outside ambulance. But a delay alone, even an egregious one, does not amount to a constitutional violation. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). In cases where the claim is that prison officials delayed rather than denied medical assistance to an inmate, the plaintiff must adduce "verifying medical evidence" that the delay, as opposed to the medical condition, caused some degree of harm. *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007); *Langston*, 100 F.3d at

1240. In other words, the plaintiff must "offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams*, 491 F.3d at 15. *Cf.*, *Cyrus v. Town of Mukwonago*, 2010 WL 4483713, 6 (7th Cir. 2010)("Common-law rules of tort causation apply to §1983 claims...."); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 (7th Cir.2010)("'unless a statute ... provides otherwise, demonstrating but-for causation is part of the plaintiff's burden in all suits under federal law....'").

The plaintiff points to no such evidence; indeed, she does not even argue that the delay was detrimental. (*Plaintiff's Brief in Opposition*, at 14; Pl.St., ¶¶27-32). Expert medical testimony that the delay exacerbated Mr. Hunt's condition, as the Seventh Circuit has said, would "clearly satisfy the requirement of verifying medical evidence. *Williams*, 491 F.3d at 715. Although plaintiff engaged three medical experts, she is unable to point to anything in their reports that suggests Mr. Hunt's condition was affected or worsened by any delay between the medical technician's response and the arrival of the ambulance. (Pl.St., ¶ 27-32). The only opinions plaintiff gleans from her experts are that "Mr. Hunt died from multiple traumatic injuries to the head;" that he "sustained a traumatic injury to his brain and head and other parts of his body, an his death was due to non-natural causes;" and that "he died of multi trauma with the fatal injury being a traumatic brain injury that led to his death." (Pl.St., ¶¶ 27-29). There is no mention of any delay in transport to the hospital contributing to Mr. Hunt's demise. The expert testimony is insufficient to raise a genuine issue of fact regarding this claim. *See Williams*, 491 F.3d at 715 ("evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him.); *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(grant of summary judgment for defendant proper where plaintiff "submitted

33

evidence documenting his diagnosis and treatment, [but] offered no evidence establishing that any delay in treatment had a detrimental effect and thus failed to raise a genuine issue of fact on an essential element of his claim."). The Sheriff is entitled to summary judgment on this claim as well.

**F.**

That leaves plaintiff's state law wrongful death claim. The Sheriff submits that he is entitled to summary judgment on this claim, arguing that plaintiff's failure to identify the Cook County Jail officers who either beat Mr. Hunt or allowed other detainees to assault him dooms her wrongful death claim under Illinois's Tort Immunity Act, 745 ILCS 10/2-109. Under the Act, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." For the Sheriff, because there is no liable employee, there can be no liability in *respondeat superior* for the Sheriff.

The plaintiff disagrees, relying on *McCottrell v. City of Chicago*, 135 Ill.App.3d 517, 520, 481 N.E.2d 1058, 1060 (1st Dist. 1985). (*Plaintiff's Response*, at 14-15). This is an odd choice, for that case holds that "it is sufficient for recovery against a public entity to prove that an *identified employee* would be liable even though that employee is not named a defendant in the action." 135 Ill.App.3d at 520, 481 N.E.2d at 1060 (emphasis supplied). There is no identified employee here, while in *McCottrell*, there was, and "the specific paramedics were identified in plaintiffs' amended complaint . . . ." 135 Ill.App.3d at 518, 481 N.E.2d at 1059.

Under Illinois law, a public employee – and, in turn, a public entity – is only liable for wilful and wanton conduct. 745 ILCS 10/2-202; 10/4-105; *Williams v. Rodriguez*, 509 F.3d 392, 405 (7th Cir. 2007); *Gordon v. Degelmann*, 29 F.3d 295, 299 (7th Cir. 1994). Conduct is willful and wanton under Illinois law if it constitutes a course of action which shows an actual or deliberate intention

34

to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property. Illinois recognizes that negligence and willful and wanton conduct are different, *see Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill.2d 429, 593 N.E.2d 522, 531 (1992); *Loitz v. Remington Arms Co., Inc.,* 138 Ill.2d 404, 563 N.E.2d 397, 402 (1990), because "willful and wanton conduct carries a degree of opprobrium not found in merely negligent behavior...." *Burke*, 593 N.E.2d at 532. Willful and wanton conduct " 'approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.'" *Loitz*, 563 N.E.2d at 402 (citation omitted). The standard for assessing whether conduct is willful and wanton is "remarkably similar" to the deliberate indifference standard. *See Chapman v. Keltner,* 241 F.3d 842, 847 (7th Cir.2001).

Although the plaintiff's submission does not delve into it, the Seventh Circuit has suggested that there might be cases where there is enough evidence about what an employee did, even though the plaintiff does not know the employee's name, that an employee's conduct can be assessed as wilful and wanton. *See Williams*, 509 F.3d at 405; *Gordon*, 29 F.3d at 299. Where the plaintiff had evidence about what an officer did but was unable to discover his or her identity, the principle would apply. But it does not apply in a case like this. With no identified officer, and no evidence as to what happened before Mr. Hunt collapsed, plaintiff cannot establish wilful and wanton – or even negligent conduct -- on anyone's part. Consequently, summary judgment is appropriate on the plaintiff's wrongful death claim as well.

Generally, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims under 28 U.S.C. §1367(c). *Wilson*

*v. Price*, 624 F.3d 369, 395 (7ᵗʰ Cir. 2010); *Porter v. Suliene*, 2010 WL 3377598, *3 (7ᵗʰ Cir. 2010);

*Doe-2 v. McLean County Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507,513 (7ᵗʰ Cir.2010). But, "[i]f

the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim, there

is no use leaving the latter to the state court." *Wright v. Associated Insurance. Cos.*, 29 F.3d 1244,

1252 (7ᵗʰ Cir.1994); *Williams*, 509 F.3d at 404. Given the bases for the disposition of plaintiff's

federal claims, this case is an inappropriate one in which to decline supplemental jurisdiction over

plaintiff's wrongful death claim.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [#148] is

GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

DATE: 12/8/10

36